United States District Court
Southern District of Texas

**ENTERED**

March 28, 2017

David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| YVONNE S. WILLIS, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 4:15-CV-02070 |
| | § | |
| NANCY A. BERRYHILL, | § | |
| ACTING COMMISSIONER OF | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT**

On February 13, 2017, the parties consented to proceed before a United States magistrate judge for all purposes, including the entry of a final judgment under 28 U.S.C. § 636(c). (Docket Entry #27). The case was then transferred to this court. Cross-motions for summary judgment have been filed by Plaintiff Yvonne Willis ("Plaintiff," "Willis"), and by Defendant Nancy A. Berryhill ("Defendant," "Commissioner"), in her capacity as Acting Commissioner of the Social Security Administration ("SSA"). (Plaintiff's Motion for Summary Judgment["Plaintiff's Motion"], Docket Entry #21; Defendant's Cross-Motion for Summary Judgment, Docket Entry #11, Defendant's Brief in Support of Cross Motion for Summary Judgment ["Defendant's Motion"], Docket Entry #12). Each party has also filed a response to the competing motions. (Defendant's Response to Plaintiff's Motion for Summary Judgment ["Defendant's Response"], Docket Entry # 22; Plaintiff's Response to Defendant's Cross Motion for Summary Judgment ["Plaintiff's Response"], Docket Entry # 23). Defendant has replied to Plaintiff's response. (Defendant's Sur-Reply to Plaintiff's Response Brief ["Defendant's Reply"], Docket Entry #26). After considering the pleadings, the evidence submitted,

and the applicable law, it is ORDERED that Defendant's motion is GRANTED, and that Plaintiff's motion is DENIED.

## Background

On March 8, 2012, Plaintiff Yvonne Willis filed applications for both Supplemental Security Income ("SSI") benefits, under Title XVI of the of the Social Security Act ("the Act"), and for Social Security Disability Insurance Benefits ("DIB") under Title II of the Act. (Administrative Transcript ["Tr."] at 36, 173-82). In her applications, Willis claimed that she had been unable to work since January 7, 2010, due to Graves' disease,[1] anxiety, chronic heart failure, atrial fibrillation,[2] pulmonary hypertension, chronic obstructive pulmonary disease ("COPD"),[3] and depression. (Tr. at 36, 196). On July 17, 2012, the Commissioner denied her applications for benefits. (Tr. at 99-102, 114-25). Plaintiff petitioned for a reconsideration of that decision, but her applications were again denied, on October 30, 2012. (Tr. at 128-32).

On December 21, 2012, Willis successfully requested a hearing before an administrative law judge ["ALJ"]. (Tr. at 133). That hearing, before ALJ Vadim Mozyrsky, took place on August 16, 2013. (Tr. at 55-97). Plaintiff appeared with her attorney, Donald Dewberry ["Mr. Dewberry"], and

---

[1]"Graves' disease" is a disorder characterized by pronounced hyperthyroidism. MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY, 712 (5th ed. 1998). It is usually associated with an enlarged thyroid gland and abnormal protrusion of the eyeballs. The origin of the disease is unknown, but it is genetic and may be autoimmune. Id. Typical signs include nervousness, fine tremor of the hands, weight loss, fatigue, breathlessness, palpitations, increased heat intolerance, increased metabolic rate, and gastrointestinal motility. Id.

[2]"Atrial fibrillation" is a cardiac arrhythmia characterized by disorganized electrical activity in the atria, accompanied by an irregular ventricular response that is usually rapid. The atria quiver instead of pumping in an organized fashion, which results in compromised vetricular filling and reduced stroke volume. Id. at 144.

[3]"Chronic obstructive pulmonary disease " or "COPD" is a progressive, irreversible condition that is characterized by diminished inspiratory and expiratory capacity of the lungs. The person complains of dyspnea with physical exertion, difficulty in inhaling or exhaling deeply, and, sometimes, a chronic cough. The condition includes chronic bronchitis, pulmonary emphysema, or asthma and is aggravated by cigarette smoking and air pollution. Id. at 338.

she testified in her own behalf. (Tr. 59-84, 91-93). The ALJ also heard testimony from Mr. Byron

Pettingill, ["Mr. Pettingill"], a vocational expert witness. (Tr. at 84–91, 93). No medical experts

testified at the hearing.

Following the hearing, the ALJ engaged in the following five-step, sequential analysis to

determine whether Plaintiff was capable of performing substantial gainful activity or was, in fact,

disabled:

1.   An individual who is working or engaging in substantial gainful activity will
     not be found disabled regardless of the medical findings. 20 C.F.R.
     §§ 404.1520(b) and 416.920(b).

2.   An individual who does not have a "severe impairment" will not be found to
     be disabled. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

3.   An individual who "meets or equals a listed impairment in Appendix 1" of
     the regulations will not be considered disabled without consideration of
     vocational factors. 20 C.F.R. §§ 404.1520(d) and 416.920(d).

4.   If an individual is capable of performing the work she has done in the past,
     a finding of "not disabled" must be made. 20 C.F.R. §§ 404.1520(f) and
     416.920(f).

5.   If an individual's impairment precludes performance of his past work, then
     other factors, including age, education, past work experience, and residual
     functional capacity must be considered to determine if any work can be
     performed. 20 C.F.R. §§ 404.1520(g) and 416.920(g).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir.

1995); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th

Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988). It is well-settled that, under this

analysis, Willis has the burden to prove any disability that is relevant to the first four steps. *Wren*,

925 F.2d at 125. If she is successful, the burden then shifts to the Commissioner, at step five, to

show that she is able to perform other work that exists in the national economy. *Myers v. Apfel,* 238

F.3d 617, 619 (5th Cir. 2001); *Wren*, 925 F.2d at 125. "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability. *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)). An individual claiming SSI benefits under the Act has the burden to prove that she suffers from a disability. *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985). Under the Act, a claimant is deemed disabled only if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing 42 U.S.C. § 423(d)(1)(A)). Substantial gainful activity is defined as "work activity involving significant physical or mental abilities for pay or profit." *Newton*, 209 F.3d at 452. A physical or mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citing 42 U.S.C. § 423(d)(3)). Further, the impairment must be so severe as to limit the claimant so that "she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any kind of substantial gainful work which exists in the national economy." *Greenspan*, 38 F.3d at 236 (citing 42 U.S.C. § 423(d)(2)(A)).

Based on these principles, as well as his review of the evidence presented at the hearing, the ALJ determined that Plaintiff has not "engaged in substantial gainful activity" since September,

2010.[4] (Tr. at 39). The ALJ further concluded that Willis suffers from "Grave's [sic] disease, chronic obstructive pulmonary disease, chronic heart failure, depression, and anxiety." (Tr. at 39). Although he determined that these impairments are severe, he concluded, ultimately, that Plaintiff's impairments do not meet, or equal in severity, the medical criteria for any disabling impairment in the applicable SSA regulations.[5] (Tr. at 39-41). He also found that Plaintiff's medically determinable hypertension and alcohol dependence are not severe impairments, because the medical records show that her hypertension is controlled with medication, and that she has abstained from alcohol use for eight years. (*Id.*).The ALJ then assessed Willis' residual functional capacity ("RFC"), and found that:

> The claimant has the [RFC] to perform light work[,] as defined in 20 CFR [§§] 404.1567(b) and 416.967(b)[,] with an ability to lift and carry 20 pounds occasionally and 10 pounds frequently, sit for a total of 6 hours in an 8-hour workday[,] and stand and/or walk for a total of 6 hours in an 8-hour workday. The claimant is able to push and pull as much as she is able to lift and carry. [She] is precluded from atmospheric irritants such as dust and gases. Mentally, [she] is limited to simple tasks and simple work-related decisions.

(Tr. at 42). Based on the medical records and Mr. Pettingill's testimony, the ALJ determined that Willis is not capable of performing her past relevant work. (Tr. at 48). However, he found that she could perform other work that exists in significant numbers in the local and national economies, including such jobs as an office cleaner, a food production worker, and a cafeteria worker. (Tr. at 49). For that reason, the ALJ concluded that Willis is "not [] under a 'disability,' as defined in the

---

[4]Although Plaintiff claims that she has been disabled since January 7, 2010, at the hearing, she testified that she had worked from her alleged onset date through September, 2010. (Tr. at 38, 60). The evidence shows that her work during that period amounts to "substantial gainful activity," which precludes any disability finding before September 2010. (Tr. at 39, 185).

[5] A claimant is presumed to be "disabled" if her impairments meet, or equal in severity, a condition that is listed in the appendix to the Social Security regulations. *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994).

Act," and he denied her applications for benefits. (*Id.*).

On January 16, 2014, Plaintiff requested an Appeals Council review of the ALJ's decision. (Tr. at 31-32). SSA regulations provide that the Appeals Council will grant a request for a review if any of the following circumstances is present:  "(1) there is an apparent abuse of discretion by the ALJ; (2) an error of law has been made; (3) the ALJ's action, findings, or conclusions are not supported by substantial evidence; or (4) there is a broad policy issue which may affect the public interest." 20 C.F.R. §§ 404.970 and 416.1470. On May 5, 2015, the Appeals Council denied her request for review, concluding that no reason for review existed under the regulations. (Tr. at 7-12).With that ruling, the ALJ's findings became final. *See* 20 C.F.R. §§ 404.984(b)(2) and 416.1484(b)(2). On July 13, 2015, Plaintiff filed this lawsuit, pursuant to section 205(g) of the Act (codified as amended at 42 U.S.C. § 405(g)), to challenge that decision. (Docket Entry #1). Subsequently, the parties filed cross-motions for summary judgment. Having considered the pleadings, the evidence submitted, and the applicable law, it is ordered that Defendant's motion is granted, and that Plaintiff's motion is denied.

**Standard of Review**

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence and whether the proper legal standards were applied. *See Randall v. Astrue*, 570 F.3d 651, 655 (5th Cir. 2009); *Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)). "If the Commissioner's findings are supported by substantial evidence, they must be affirmed." *Id.* "'Substantial evidence is more than a scintilla, less than a preponderance, and is such that a reasonable mind might accept it as adequate to support a conclusion.'" *Randall*, 570 F.3d at 662 (*quoting Randall v. Sullivan*, 956 F.2d

105, 109 (5th Cir. 1992)); *accord Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995). On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *see Randall*, 570 F.3d at 662; *Carey v. Apfel*, 230 F.3d 131, 146 (5th Cir. 2000). In making this determination, the court must weigh the following four factors: the objective medical facts; the diagnoses and opinions from treating physicians on subsidiary questions of fact; Plaintiff's own testimony about her pain; and Plaintiff's educational background, work history, and present age. *See Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991). If there are no credible evidentiary choices or medical findings that support the Commissioner's decision, then a finding of no substantial evidence is proper. *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001) (quoting *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000)).

**Discussion**

Before this court, Plaintiff challenges the Commissioner's decision on two grounds. She argues, first, that the ALJ improperly considered the effects of smoking in assessing her residual functional capacity. (Plaintiff's Motion at 6–8). She claims that the ALJ erred, because he relied on her failed efforts to stop smoking to support a finding that she is not disabled. (*Id*.). Plaintiff also alleges that the ALJ's RFC finding is not supported by substantial evidence. (*Id*. at 9-10). She contends, specifically, that the ALJ's determination that she cannot work in environments that contain "dust and gases" contradicts his conclusion that she can perform available work. (*See id*. at 9). Defendant, however, maintains that the ALJ properly considered all of the available evidence, and followed the applicable law, in determining that Willis is not disabled under the Act, and that she is not entitled to an award of Social Security Income benefits. (Defendant's Motion at 5-8, 9-11).

7

***Medical Facts, Opinions, and Diagnoses***

The earliest medical records show that, between 1989 and 2005, Plaintiff consistently complained of anxiety and depression. (*See generally* Tr. at 277-334). She reported symptoms including nervousness, paranoia, dizziness, stomach discomfort, and an elevated heart rate. Her physician diagnosed her as suffering from panic attacks. (Tr. at 331). Xanax and Effexor were prescribed to treat her symptoms. (Tr. at 317, 318, 327, 328, 331). Plaintiff also complained that she awoke frequently in the middle of the night, and so she was prescribed 10 mg of Ambien to help her sleep soundly. (Tr. at 286, 287, 288, 291, 293, 299, 303, 315). Willis reported little improvement in her symptoms, despite multiple adjustments to her medication.

Plaintiff also admitted that she was a heavy smoker, and consumed two packs of cigarettes, a day. (Tr. at 326). She claimed that she wanted to stop smoking, but she was unable to do so. (*Id.*). In 2000, Plaintiff was diagnosed as suffering from alcohol dependence. (Tr. at 286). She abstained from alcohol use for a short period, but she began drinking again in 2001. (Tr. at 284). In October, 2003, Willis reported that she was drinking no more than four beers a night. (Tr. at 283). In 2005, she was referred to an addictive disorders clinic for treatment of alcoholism.[6] (Tr. at 277).

The next records show that Plaintiff received treatment at Memorial Hermann Katy Hospital ["Memorial Hermann"] from October 25, 2010, to February 21, 2011. (Tr. at 335-56). On October 25, 2010, Willis had an x-ray of her chest, which revealed bilateral hyperinflation of the lungs. (Tr. at 336). It also showed a six millimeter calcified nodule in the right, upper lung. Based on that image, the attending physician concluded that Plaintiff was likely suffering from chronic obstructive

---

[6]At the time of the hearing, Plaintiff had been abstinent from alcohol for eight years. Tr. at 63).

pulmonary disease ["COPD"]. (*Id.*). On January 18, 2011, Willis was seen by Dr. Kevin Kendall ["Dr. Kendall"], an internist at Memorial Hermann. (Tr. at 355). Plaintiff told Dr. Kendall that she had been coughing up phlegm for approximately three weeks, and that she had been diagnosed with bronchitis. (*Id.*). She said that she had been prescribed antibiotics, but that her symptoms had not improved. She stated that she smokes about two packs of cigarettes, a day, and that she had been experiencing dyspnea,[7] a cough, fatigue, and tightness in her chest. (*Id.*). Dr. Kendall observed that Plaintiff was in atrial fibrillation, so he admitted her to the hospital. (Tr. at 345, 352-53, 355). He found that her atrial fibrillation was likely due to a combination of pulmonary hypertension and severe COPD. (Tr. at 348). Dr. Kendall referred her to Dr. Ajay Jain ["Dr. Jain"], a pulmonologist at Memorial Hermann, for a consultation regarding those symptoms. (Tr. at 344-47).

Plaintiff told Dr. Jain that her dyspnea had worsened over several months. (Tr. at 345). She also reported a cough, congestion, wheezing, dry sinuses, and occasionally bloody sinus drainage. She said that, over the past week, she had been experiencing fatigue and leg swelling, as well. Willis claimed that she had quit smoking several days before her hospital admission. She added that she had been breathing more easily since she stopped smoking. (*Id.*). However, she was put on a nicotine inhaler due to her severe tobacco addiction. (Tr. at 348). Willis later had an echocardiogram,[8] which showed pulmonary hypertension.[9] (Tr. at 348, 350-51). A chest x-ray showed minimal chronic heart

---

[7]"Dyspnea" is a distressful sensation of uncomfortable breathing that may be caused by certain heart conditions, strenuous exercise, or anxiety. *Id.* at 527.

[8]An "echocardiogram" is a graphic outline of movements of the heart structures compiled from ultrasound vibrations that are reflected from these structures. *Id.* at 531.

[9]"Pulmonary hypertension" is a condition of abnormally high pressure within the pulmonary circulation. *Id.* at 1356.

9

failure. (Tr. at 346). Dr. Jain recommended that Willis begin nebulizer[10] therapy with Albuterol and Atrovent, as well as an inhaler, to treat her COPD. (*Id.*). He also recommended that she return for another echocardiogram, in several months, and that she abstain from tobacco use. (*Id.*). Willis was discharged on January 20, 2011. (Tr. at 348). She was instructed to follow-up with Dr. Kendall in one week, for further evaluation of her atrial fibrillation and blood pressure. (*Id.*).

On April 29, 2011, Willis was seen by Dr. Punita Singh ["Dr. Singh"], an internist at El Franco Lee Health Center ["El Franco Lee Center"], for an annual physical examination. (Tr. at 426-31, 645-48). She complained of palpitations, generalized weakness, and shortness of breath. (Tr. at 426). She then stated that she had lost twenty pounds, unintentionally, after being discharged from Memorial Hermann. (*Id.*). Dr. Singh ordered a comprehensive metabolic panel, as well as an x-ray of Plaintiff's chest and a computerized tomography ["CT"] scan of her neck. (Tr. at 428). She then recommended that Willis see a cardiologist and a pulmonologist at Ben Taub General Hospital ["Ben Taub"] to evaluate Willis' chronic heart failure, atrial fibrillation, and pulmonary hypertension. (Tr. at 428, 648). Plaintiff sought treatment at Ben Taub the same day. (Tr. at 583, 648).

When Willis arrived at Ben Taub, on April 29, 2011, she told the nurse that she suffered from chronic heart palpitations. (Tr. at 648). She described her symptoms, which included an irregular heartbeat, shortness of breath, weakness, and leg swelling. (Tr. at 648, 649). Plaintiff attributed her symptoms to anxiety, and she denied any chest pain or pressure. Willis admitted that, prior to January, 2011, she had smoked two and one half packs of cigarettes, a day, but that she currently

---

[10]A "nebulizer" is a device for producing a fine spray. *Id.* at 1086. Intranasal medications are often administered by a nebulizer. *Id.*

smoked only half of a pack, a day. (Tr. at 649). An irregular heart rhythm and tachycardia[11] were noted during the examination.(*Id.*). The doctor found that the atrial fibrillation was likely caused by hyperthyroidism, so he ordered a series of tests to check the function of her thyroid gland, as well as an ultrasound of her neck. (Tr. at 643). Willis was then admitted to Ben Taub for further evaluation. (*Id.*).

Plaintiff's thyroid function tests showed abnormal results. (Tr. at 657-58, 660, 661). An ultrasound of her neck, dated April 29, 2011, showed a markedly vascular enlarged thyroid, and two mildly hyperchoic nodules in the left thyroid lobe. (Tr. at 661). The nodules did not have the appearance of calcifications, but appeared to be localized inflammations, instead. (*Id.*). The doctor reported that these results were consistent with Graves' disease. (*Id.*). An x-ray of Willis' chest, dated April 30, 2011, revealed an enlarged cardiac silhouette, with a mildly prominent pulmonary vasculature, which suggests an increased intravascular volume.  (Tr. at 641, 654).

On April 30, 2011, Willis had a consultation with Dr. Sonali Thosani ["Dr. Thosani"], an endocrinologist[12] at Ben Taub. Plaintiff reported that she had noticed increased swelling in her neck over the last year. (Tr. at 617). She said that, in the last six months, she had lost over twenty pounds, and that she had a poor appetite, diarrhea, brittle nails, itching, insomnia, fatigue, and muscle weakness. (Tr. at 616, 617). Willis said that her eyes had been dry and itchy, as well. (Tr. at 617). She added that she had a family history of thyroid problems, but that she was unsure of the details of her relatives' illnesses. Dr. Thosani diagnosed Plaintiff as suffering from Graves' disease,  and

[11]"Tachycardia" is a condition in which the myocardium contracts at a rate greater than 100 beats per minute. *Id.* at 1584.

[12]An "endocrinologist" is an physician who studies the network of ductless glands and other structures that secrete hormones directly into the bloodstream. *Id.* at 560.

recommended that Plaintiff take 30 mg of Methimazole, daily, and 40 mg of Propranalol, three times a day. (Tr. at 620).

A transthoracic echocardiogram, dated May 2, 2011, showed mild dilation and normal wall thickness in the left ventricle. (Tr. at 373). It also showed a diastole[13] consistent with right ventricular pressure and volume overload. Overall function of the left ventricle was in the low normal range. (*Id*.). Mild to moderate thickening of the mitral valve[14] was also apparent. The radiologist ultimately concluded that Willis was suffering from pulmonary hypertension. (Tr. at 375). She was discharged from Ben Taub later that day. (Tr. at 583).

On June 1, 2011, Willis again saw Dr. Thosani. (Tr. at 577-82). Plaintiff reported no improvement in her symptoms. (Tr. at 577). Dr. Thosani observed that Willis was very thin, and that she had lost a significant portion of subcutaneous fat. (Tr. at 578). She also observed a sixty to sixty-five gram thyroid gland that was absent of any distinct nodules. (*Id*.). Dr. Thosani concluded that Plaintiff's hyperthyroidsim had not improved, so she increased the Propranalol dosage, and ordered additional thyroid function tests. (Tr. at 579). She then recommended that Willis return in six weeks. (*Id*.).

On August 8, 2011, Plaintiff saw Dr. Suneesh Nair ["Dr. Nair"], an internist at the Pulmonary Clinic at Ben Taub, for an evaluation of her COPD. (Tr. at 571-76). Willis informed Dr. Nair that she smoked one pack of cigarettes, a day. (Tr. at 571). However, she said that her shortness

---

[13]A "diastole" is the period between contractions of the atria or ventricles during which blood enters the relaxed chambers from the systemic circulation of the lungs. *Id.* at 484. Ventricular diastole begins with the onset of the second heart sound and ends with the first heart sound. *Id.*

[14]The "mitral valve" is a bicuspid valve situated between the left atrium and the left ventricle; the only valve with two, rather than three cusps. *Id.* at 1040. The mitral valve allows blood to flow from the left atrium into the left ventricle, but prevents blood from flowing back into the atrium. *Id.*

of breath had improved significantly, and that it did not limit her activities. She admitted that she coughed occasionally, and that she had not taken Albuterol or Symbicort since June, 2011. (*Id*.). Dr. Nair recommended that Plaintiff have pulmonary function tests, and he counseled her to stop using tobacco. (Tr. at 574). She agreed that she would attempt to quit "th[a]t week." (*Id*.). He also recommended that she see an endocrinologist for further evaluation of her Graves' disease, and he put her on a low dose regimen of aspirin, to treat her atrial fibrillation. (*Id*.).

On October 31, 2011, Willis underwent pulmonary function testing at Ben Taub. (Tr. at 569-70). The spirometry test[15] showed that she had normal lung volumes, with mildly reduced diffusing capacity. (Tr. at 570). The resting room air stats during the testing were normal. (*Id*.).

On November 18, 2011, Plaintiff returned to the El Franco Lee Center, reporting that she had been experiencing high levels of anxiety. (Tr. at 418-20). She requested a psychiatric consultation to review her anxiety medication.(Tr. at 419). Willis reported no chest pain, dyspnea, or palpitations, at that time. (*Id*.). On December 14, 2011, Willis again saw Dr. Singh. (Tr. at 412). She acknowledged that she smoked heavily, and that she was not ready to quit. (*Id*.). Dr. Singh observed that Plaintiff's mood was dysphoric, and that her right thryroid gland was swollen. (Tr. at 413). She ordered Plaintiff to follow-up with an endocrinologist and a pulmonologist, and she again advised her to quit smoking. (Tr. at 414).

On January 13, 2012, Plaintiff met with a behavioral therapist at the El Franco Lee Center. (Tr. at 409). She stated that she had been struggling with intermittent anxiety and depression. She also said that she had had fluctuating energy and weight levels. (*Id*.). She identified herself as a

---

[15]A "spirometry" test is a laboratory evaluation of the air capacity of the lungs by means of an instrument that measures and records the volume of inhaled and exhaled air, for the purpose of assessing pulmonary function. *Id.* at 1525.

recovering alcoholic, and she claimed that she had been trying to quit smoking. The therapist developed a treatment plan, which included goals related to Willis' interpersonal functioning, self esteem, and thought processes. (Tr. at 310). The therapist advised Plaintiff to return for a follow-up appointment in one month. (*Id*.).

On February 9, 2012, Willis was seen by Dr. Stephanie Sim ["Dr. Sim"], a psychiatrist at El Franco Lee Center, with complaints of anxiety. (Tr. at 397). Plaintiff explained that she is "hyper," that she has difficulty sitting still, and that she worries about "everything." (Tr. at 397-98). However, she denied experiencing any depression, insomnia, or panic attacks. Willis admitted that she smokes two packs of cigarettes, a day, but claimed that she had been trying to smoke less. (Tr. at 398). Dr. Sim described her mood as depressed, and her affect as blunted. She ascribed a GAF score of 55,[16] to Plaintiff, and she instructed her to return for a follow-up appointment in two to three months. (*Id*.). When Willis went back to Dr. Sim, on April 19, 2012, she reported that her anxiety had improved, and that she had maintained good energy and motivational levels. (Tr. at 387-89, 488-90). She also said that she had not had any anxiety attacks in the interim. (Tr. at 388). Plaintiff told Dr. Sim that she had continued to experience mild insomnia and restlessness, and that, sometimes, she worried about traveling and her finances. (Tr. at 389). Plaintiff, again, conceded that she smokes two packs of cigarettes every day. (Tr. at 389). Dr. Sim reported that Willis' affect was mildly anxious, but that her mood was good. She, again, ascribed a GAF score of 55, to Plaintiff. (*Id*.). Dr. Sim

---

[16]The GAF scale is used to rate an individual's "overall psychological functioning." AMERICAN PSYCHIATRIC INSTITUTE, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV") 32 (4th ed. 1994). The scale ascribes a numeric range from "1" ("persistent danger of severely hurting self or others") to "100" ("superior functioning") as a way of categorizing a patient's emotional status. *See id.* A GAF score in the "51 to 60" range indicates "moderate symptoms" (e.g., flat affect and circumstantial speech occasional panic attacks) OR moderate difficulty in social occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* at 34. It is important to note that the GAF scale was dropped from DSM-5 because of its "conceptual lack of clarity . . . and questionable psychometrics in routine practice." AMERICAN PSYCHIATRIC INSTITUTE, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-5") 16 (5th ed. 2013).

decreased Willis' sleep medication, and instructed her to return to the clinic in two to three months. (*Id.*).

On February 22, 2012, Plaintiff received follow-up treatment from Dr. Thosani. (Tr. at 562-68). Willis reported some anxiety and heart palpitations, as well as itching and redness in her eyes. (Tr. at 562). Plaintiff also reported that she sometimes experiences a "choking sensation." (Tr. at 562). She said that she had gained some weight, but complained of a generalized feeling of weakness. (Tr. at 563). During the examination, Dr. Thosani noted that Plaintiff had an enlarged goiter, a fifty gram thyroid gland, and tachycardia, with irregular rhythm. (*Id.*). Dr. Thosani referred Willis to Dr. James Suliburk ["Dr. Suliburk"], a surgeon at Ben Taub, to discuss a thyroidectomy.[17] (Tr. at 564). She then recommended that Plaintiff return in three months. (*Id.*).

On April 17, 2012, Willis had a consultation regarding her hyperthyroidism with Brian Lassinger ["Lassinger"], a physician's assistant at Ben Taub's Surgery Clinic. (Tr. at 554–58). Lassinger reviewed Plaintiff's medical history and her symptoms, which included a cough and mild obstructive COPD. (Tr. at 554). He observed that Willis was thin, and that she spoke with a raspy voice. (Tr. at 555). Her neck appeared to be firm, and her thyroid was enlarged. Near the end of the consultation, Lassinger informed Plaintiff that she would likely undergo a thyroidectomy, after receiving clearance from her physicians. (*Id.*).

Willis returned to Ben Taub, on April 24, 2012, for myocardial perfusion imaging.[18] (Tr. at

---

[17]A "thyroidectomy" is the surgical removal of the thyroid gland. *Id.* at 1616. It is performed for colloid goiter, tumors, or hyperthroidism that does not respond to iodine therapy and antithyroid drugs. *Id.*

[18]"Myocardial perfusion imaging" is a non-invasive imaging test that shows how well blood flows through (perfuses) an individual's heart muscle. Substances are injected into the blood to reveal areas in which insufficient blood flows to the heart through the coronary arteries. *Id.* at 1072.

367-69). The scan returned normal results, and it showed no evidence of ischemia[19] or scarring. (Tr. at 367-69, 495-96). It also revealed normal left ventricular systolic function, overall. (Tr. at 495). The next day, Plaintiff met with Dr. Singh. (Tr. at 383-87, 483-86). Willis said that she had stopped drinking, but that she continued to smoke. She denied experiencing any shortness of breath or chest pain. (Tr. at 384). Plaintiff then told Dr. Singh that she had scheduled a thyroidectomy, but that she was waiting for preoperative clearance from her cardiologist. She also said that her mood had been stable on her current medications. (*Id*.). Dr. Singh observed that Plaintiff's thyroid gland was enlarged. She also observed that Plaintiff was breathing normally, and that she did not appear to be in respiratory distress. (Tr. at 385). Dr. Singh instructed Willis to follow-up with her psychiatrist, regarding her depression. (*Id*.). She also encouraged Plaintiff to quit smoking, and to attend tobacco cessation classes, if necessary. (*See id*.).

On June 28, 2012, Plaintiff reported to Ben Taub for a pre-operative physical assessment. (Tr. at 544-47). Lassinger noted that Willis coughed frequently, and that the cough produced white sputum. (Tr. at 544). He observed no other abnormalities. (Tr. at 544-47). A chest x-ray, dated June 29, 2012, showed no acute thoracic abnormality which might interfere with Plaintiff's surgery. (Tr. at 710).

On July 12, 2012, Dr. Susan Posey, Psy.D ["Dr. Posey"], a psychiatrist acting on behalf of the state, signed a SSA Psychiatric Review Technique Form ("PRTF"). (Tr. at 447-60). After reviewing the medical evidence, Dr. Posey found that Plaintiff suffers from an anxiety disorder, and alcohol dependence, in full remission. (Tr. at 452, 455). She further found that her impairments did

---

[19]"Ischemia" is a decreased supply of oxygenated blood to a body organ or part. *Id.* at 876. The condition is often marked by pain and organ dysfunction, as in ischemic heart disease. *Id.*

not satisfy the criteria found in the 12.06 listing[20] on Anxiety-Related Disorders, or in the 12.09

listing[21] on Substance Addiction Disorders. (*See id.*). In assessing her functional limitations, under

the criteria in paragraph B, Dr. Posey found that Plaintiff had mild restrictions in her daily activities,

in her ability to maintain social functioning, and in her ability to maintain concentration, persistence,

or pace. (Tr. at 457). She determined that Willis had experienced no episodes of decompensation

---

[20]Listing 12.06 requires a showing of the following conditions:
A. Medically documented findings of at least one of the following:
    1. Generalized persistent anxiety accompanied by three out of four of the following signs or
symptoms:
        a. Motor tension; or
        b. Autonomic hyperactivity; or
        c. Apprehensive expectation; or
        d. Vigilance and scanning;
    2. A persistent irrational fear of a specific object, activity, or situation which results in a
compelling desire to avoid the dreaded object, activity, or situation; or
    3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense
apprehension, fear, terror and sense of impending doom occurring on the average of at least once a
week; or
    4. Recurrent obsessions or compulsions which are a source of marked distress; AND
B. Resulting in at least two of the following;
    1. Marked restriction in activities of daily living; or
    2. Marked difficulties in maintaining social functioning; or
    3. Marked difficulties in maintaining concentration, persistence, or pace; or
    4. Repeated episodes of decompensation, each of extended duration. OR
C. Resulting in complete inability to function independently outside the area of one's home.

20 C.F.R. Part 404, Subpt. P. Appendix 1 § 12.06.

[21]Listing 12.09 requires a showing of the following conditions:
A. Behavioral changes or physical changes associated with regular use of substances that affect the central
nervous system.
    The required level of severity for these disorders is met when the requirements in any of the following (A
through I) are satisfied.
    A. Organic mental disorders. Evaluate under 12.02.
    B. Depressive syndrome. Evaluate under 12.04.
    C. Anxiety disorders. Evaluate under 12.06.
    D. Personality disorders. Evaluate under 12.08.
    E. Peripheral neuropathies. Evaluate under 11.14.
    F. Liver damage. Evaluate under 5.05.
    G. Gastritis. Evaluate under 5.00.
    H. Pancreatitis. Evaluate under 5.08.
    I. Seizures. Evaluate under 11.02 or 11.03.

20 C.F.R. Part 404, Subpt. P. Appendix 1 § 12.09.

of extended duration, and that the evidence did not establish the presence of paragraph C criterion. (Tr. at 457, 458). Dr. Posey concluded that, although Plaintiff is "somewhat limited by depression and anxiety, [] the impact of [her] symptoms does not wholly compromise [her] ability to function independently, appropriately, and effectively on a sustained basis." (Tr. at 459).

On July 3, 2012, Willis reported to Ben Taub's Department of General Surgery for a total thyroidectomy and bilateral inferior parathyroid autotransplant. (Tr. at 524-37). She tolerated the procedure well, and suffered no complications. (Tr. at 524, 695). She was kept overnight for observation, and she was reported to be walking, tolerating a regular diet, and using the restroom appropriately. She was discharged on July 4, 2012, with instructions to return for a follow-up appointment in two weeks. (Tr. at 526, 696). A surgical pathology report, dated July 10, 2012, shows that the tissue removed during Plaintiff's thyroidectomy was negative for carcinoma.[22] (Tr. at 713). The staff pathologist at Ben Taub noted that the tissue characteristics were consistent with Graves' disease. (Tr. at 714).

On July 13, 2012, Dr. Laurence Ligon ["Dr. Ligon"], a family practitioner acting on behalf of the state, prepared an evaluation of Willis' physical residual functional capacity. (Tr. 461-68). After reviewing the medical evidence, Dr. Ligon made several observations. He found that Plaintiff could occasionally lift or carry items weighing up to twenty pounds; she could frequently lift or carry items weighing up to ten pounds; she could stand for about six hours in an eight-hour workday; she could sit for about six hours in an eight-hour workday; and she could perform an unlimited amount of pushing and pulling, within the weight limitations previously stated. (Tr. at 462). Dr.

---

[22]"Carcinoma" is a malignant epithelial neoplasm that tends to invade surrounding tissue and to metastasize to distant regions of the body. *Id.* at 264. Carcinomas develop most frequently in the skin, large intestine, lungs, stomach, prostate, cervix, or breast. *Id.*

Ligon found that Willis had no postural, manipulative, visual, or communicative limitations. (Tr. at 463-65). However, he found that Plaintiff should avoid concentrated exposure to environments containing fumes, odors, dusts, gases, and poor ventilation systems. (Tr. at 465). Ultimately, Dr. Ligon determined that the alleged severity and limiting effects of Plaintiff's impairments were partially supported by the medical evidence. (Tr. at 466). On October 25, 2012, that physical residual functional capacity assessment was affirmed, as written, by Dr. Patty Rowley, ["Dr. Rowley"], a nephrologist retained by the state. (Tr. at 719).

On July 24, 2012, Plaintiff had a follow-up appointment with Dr. Suliburk. (Tr. at 521-23). He found that her voice and cough were strong, and that her wound had healed well. (Tr. at 521). He instructed her to take a multivitamin, daily, and to return, if necessary. (*Id.*).

On August 8, 2012, Willis had an appointment with Dr. Jesslyn Lu ["Dr. Lu"], an endocrinologist at Ben Taub. (Tr. at 513-20). Plaintiff told Dr. Lu that she had had a total thyroidectomy on July 3, 2012. (Tr. at 515). She reported that she suffered from occasionally dry and itchy eyes, heart palpitations, dyspnea, and anxiety. (Tr. at 513). Willis admitted that she continued to smoke, and Dr. Lu advised her to quit. (Tr. at 515). Plaintiff was instructed to follow-up with her cardiologist, regarding her cardiac medications, and to return to Dr. Lu in five to six months. (*Id.*).

On August 9, 2012, Willis presented to Dr. Sim, with complaints of worsening anxiety.. (Tr. at 479-82). Her symptoms included mood lability, crying spells, anxiety, nervousness, stomach discomfort, restlessness, low energy and motivational levels, and irregular sleep patterns. (Tr. at 480). She denied having any suicidal ideation, mania, or psychotic symptoms. (*Id.*). During her examination, Dr. Sim observed that Plaintiff's mood was labile, and that her affect was anxious, at

19

times, while blunted, at others. She increased Plaintiff's Effexor dosage, and she instructed her to return to the clinic in two months. (Tr. at 481).

Plaintiff had another follow-up appointment with Dr. Singh on August 21, 2012. (Tr. at 475-78). Willis reported that she underwent a thyroidectomy in July, 2012, and that she "feel[s] ok [sic]." (Tr. at 475). She admitted that she smokes one and a half packs of cigarettes, each day. Plaintiff complained of fatigue, generalized weakness, fever, anxiety, and depression. (Tr. at 477). Dr. Singh, again, advised Plaintiff to quit smoking, to research Chantix, and to schedule an appointment with a pulmonologist, to address her COPD. (*Id.*). She also instructed Willis to consult her cardiologist, because she was no longer in atrial fibrillation, and to return in two months. (Tr. at 478).

A transthoracic echocardiogram, dated September 6, 2012, showed normal left ventricular function. No wall motion abnormalities were noted in that region. (Tr. at 504, 700). The mitral leaflets were mildly thickened, and the regurgitant volume is consistent with mild to moderate mitrial regurgitation.[23] It also revealed mild thickening of the aortic valve. (*Id.*). Visually, the pulmonary artery appeared to be generous in size. (Tr. at 701). After reviewing the echocardiogram, Dr. Allison Pritchett ["Dr. Pritchett"], a cardiologist at Ben Taub, diagnosed Plaintiff as suffering from heart palpitations and mitrial regurgitation. (Tr. at 506).

On September 8, 2012, Willis saw Dr. Arunima Misra ["Dr. Misra"], a cardiologist at Ben Taub's Cardiology Clinic. (Tr. at 507-12). Plaintiff reported that she experiences anxiety related heart palpitations, which typically last a few minutes, and then dissipate when the anxiety resolves. (Tr. at 507). She denied any chest pain or dizziness, but she did complain of dyspnea, with exertion.

---

[23]"Mitrial regurgitation" is a backflow of blood from the left ventricle into the left atrium in systole across a diseased valve. *Id.* at 1040. The condition may result from congenital valve abnormalities, rheumatic fever, mitrial valve prolapse, endocardial fibroelastosis, dilation of the left ventricle as a result of severe anemia, myocarditis, or myocardiopathy. Symptoms include dyspnea, fatigue, intolerance of exercise, and heart palpitations. *Id.*

20

(*Id*.). She stated that she used tobacco, but at lower levels than she had in the past. Dr. Misra recorded the data collected from a twenty-seven hour ambulatory electrocardiogram[24] monitoring performed on Willis. (Tr. at 509). The data showed normal sinus rhythm, no conduction abnormalities or pacemaker activity, and no significant S-T segment changes. (*Id*.). Plaintiff also underwent a treadmill stress test. She had no arrhythmias within ten minutes of exercise. However, Dr. Mistras recommended that Plaintiff have another transthoracic echocardiogram, due to the mitrial regurgitation seen on the previous echocardiogram, and the "borderline functioning" of her heart. (Tr. at 510). She added that Willis may need a cardiac catheterization if her cardiac symptoms persisted. (*Id*.).

On October 29, 2012, Dr. Richard Campa, Ph.D ["Dr. Campa"], a psychologist acting on behalf of the state, signed a SSA Psychiatric Review Technique Form ("PRTF"). (Tr. at 721-34). After reviewing the medical evidence, Dr. Campa found that Plaintiff suffers from an anxiety disorder, not otherwise specified, and alcohol dependence, in full remission. (Tr. at 726, 729). He further found that her impairments did not satisfy the criteria found in the 12.06 listing on Anxiety-Related Disorders, or in the 12.09 listing on Substance Addiction Disorders. (*See id*.). In assessing her functional limitations, under the criteria in paragraph B, Dr. Campa found that Plaintiff had mild restrictions in her daily activities, and moderate restrictions in her ability to maintain social functioning, and in her ability to maintain concentration, persistence, or pace. (Tr. at 731). He also determined that Willis had experienced no episodes of decompensation of extended duration, and that the evidence did not establish the presence of paragraph C criterion. (Tr. at 731, 732). Dr.

---

[24]An "electrocardiograph" is a device used for recording the electrical activity of the myocardium to detect transmission of the cardiac impulse through the conductive tissues of the muscle. *Id.* at 542. Electrocardipgraphy allows diagnosis of specific cardiac abnormalities. *Id.*

Campa concluded that, "overall, the [evidence] does not reflect a degree of [] symptoms that would wholly compromise [Plaintiff's] capacity for work related abilities." (Tr. at 733).

On October 29, 2012, Dr. Campa also prepared an evaluation of Willis' mental residual functional capacity, on behalf of the state. (Tr. at 735-38). After reviewing the medical evidence, Dr. Campa made several observations. Under the category of "Understanding and Memory," he stated that Plaintiff was "not significantly limited" in any of the stated subcategories. (Tr. at 735). Under the category of "Sustained Concentration and Persistence," Dr. Campa found that Plaintiff was "moderately limited" in her ability to carry out detailed instructions, in her ability to maintain attention and concentration for extended periods, and in her ability to work in coordination with or in proximity to others, without being distracted by them. (*Id.*). He also noted that Willis was "not significantly limited" in her ability to complete a normal workweek, without interruptions from her impairments; in her ability to perform activities within a schedule, maintain regular attendance, and be punctual; in her ability to carry out short and simple instructions; in her ability to sustain an ordinary routine without special supervision; or in her ability to make simple work-related decisions. (Tr. at 735-36). Under the category of "Social Interaction," Dr. Campa found that Willis was "moderately limited" in her ability to accept instructions, and respond appropriately to criticism from supervisors; and in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. at 736). However, he determined that Plaintiff was "not significantly limited" in any of the other subcategories. (*Id.*). Under the category of "Adaptation," Dr. Campa found that Plaintiff was "moderately limited" in her ability to respond appropriately to changes in the work setting, but that she was "not significantly limited" in any of the subcategories. (*Id.*).

On November 7, 2012, Plaintiff saw Dr. Misra, and complained of heart palpitations. (Tr.

22

at 741-45). Willis admitted that she still used tobacco, but she insisted that she had substantially cut down on the amount that she smokes. (Tr. at 741). Dr. Misra did not find thyromegaly in Plaintiff's neck, and her cardiovascular output occurred at a regular rate and rhythm. (Tr. at 742). Dr. Misra instructed Willis to stop drinking coffee and to stop smoking, and she discharged her from the Ben Taub Cardiology Clinic. (Tr. at 744).

Willis returned to Dr. Sim on November 8, 2012. (Tr. at 763-68). She reported that she had not been sleeping well, and that her energy level had been inconsistent. (Tr. at 763). She explained that, on same days, she was "hyper," and, on other days, she had very low energy. (*Id*.). Plaintiff also said that, sometimes, she has stomach or chest discomfort, before social outings. She denied having any panic attacks or racing thoughts. She rated her anxiety as a "five[,]" on a scale of one to ten. (*Id*.). Dr. Sim observed that Willis was alert, and that she spoke at a normal rate and volume. She found her mood to be labile, and her affect to be anxious, at times, while blunted and reactive, at others. (Tr. at 764). Dr. Sim instructed Plaintiff to continue taking the Effexor, as prescribed, and she told her to return in two to three months. (*Id*.).

On January 9, 2013, Plaintiff sought additional treatment from Dr. Singh. (Tr. at 755-59). Willis reported that her palpitations persisted. (Tr. at 755). She said that she had also been suffering from some dyspnea, on exertion, particularly when climbing stairs. She added that she had not yet quit smoking, but that she would try to do so. (*Id*.). Dr. Singh found no remarkable characteristics or symptoms during her examination of Willis. (Tr. at 757). She, again, urged Plaintiff to quit smoking. (*Id*.). She also ordered a chest x-ray and a transthoracic echocardiogram. Dr. Singh then suggested that Willis see her pulmonologist regarding her COPD and dyspnea. (*Id*.). Willis' chest x-ray, dated January 9, 2013, showed no acute thoracic abnormality. (Tr. at 760).

23

On January 17, 2013, Willis received follow-up treatment from Dr. Sim. (Tr. at 747-51). She told Dr. Sim that her insomnia had been "terrible[,]" because she had only been getting about four or five hours of sleep, each night. (Tr. at 747). She added that her energy level had been low, and that her mood had been "down." Willis also admitted that she had not been attending Alcoholics Anonymous ["AA"] meetings, because of transportation problems. She complained that she felt as if she had been in a "rut." (*Id.*). Overall, she rated her anxiety as a "five[,]" on a scale of one to ten. Dr. Sim increased Plaintiff's Effexor dosage, and she encouraged her to exercise and engage in activity. (Tr. at 748). She also instructed her to return in two to three months. (*Id.*).

On February 7, 2013, Willis sought treatment from Dr. Leonard Chow ["Dr. Chow"], a pulmonology and internal medicine physician at the Harris County Hospital District Smith Clinic ["Smith Clinic"]. (Tr. at 804-10). Plaintiff reported that she had been prescribed Symbicort and Proventil to treat her COPD in February, 2011. She admitted that she had not been taking those medications as instructed. (*See* Tr. at 804). She also conceded that she was still an active smoker. Willis complained that she had been suffering from increasing dyspnea, with exertion, as well as weakness and occasional palpitations. She denied experiencing any blurry vision, hemoptysis,[25] leg swelling, or chest pain. Dr. Chow ordered a spirometry, which revealed mild obstruction, without significant bronchodilator[26] response. (Tr. at 806). It also showed a resting oxygen saturation of 99%. Dr. Chow then prescribed Albuterol and Spiriva to treat Willis' COPD. In addition, he encouraged her to quit smoking, and to return to the clinic in four months. (Tr. at 806, 809).

---

[25]"Hemoptysis" is the coughing up of blood from the respiratory tract. *Id.* at 748.

[26]A "bronchodilator" is a substance, especially a drug, that relaxes contractions of the smooth muscle of the bronchioles to improve ventilation to the lungs. *Id.* at 230. Pharmacologic bronchodilators are prescribed to improve areation in asthma, brnochietasis, bronchitis, and emphysema. *Id.*

On February 13, 2013, Willis had another appointment with Dr. Lu. (Tr. at 796-803). She complained of fatigue and sluggish bowels. (Tr. at 796). She also said that her depression had worsened, and that her sleeping patterns had been irregular. (*Id*.). Plaintiff told Dr. Lu that she had not been working, and that she continued to smoke one and a half packs of cigarettes, every day. (*Id*.). Dr. Lu noted that Willis had mild proptosis[27] of the right eye. (Tr. at 799). At the end of the visit, Dr. Lu recommended that Plaintiff quit smoking, and that she to return in two months for additional thyroid function tests. (Tr. at 799, 800).

On April 3, 2013, Plaintiff was again seen by Dr. Misra. (Tr. at 775-82). Willis continued to report fatigue when climbing a flight of stairs, however, she said that she no longer became short of breath when doing so. (Tr. at 775). She also reported occasional chest tightness, which she believed to have been stress induced. Plaintiff complained of occasional palpitations, but she said that she was "not bothered by it much." (*Id*.). She later acknowledged that she still smoked. After examining Willis, Dr. Misra decided that she did not require cardiac catheterization, at that time. (Tr. at 779). Instead, she instructed Plaintiff to return in four to six months for another echocardiogram. She also counseled Willis on her diet restrictions, exercise, and smoking cessation. (*Id*.).

On April 4, 2013, Willis had another appointment with Dr. Sim. (Tr. at 837-42). Plaintiff reported that her depression had improved, but that she continued to struggle with mood lability. (Tr. at 837). She stated that her energy and motivation had been low, and that her concentration had been "so-so." She stated that she had had stomach discomfort when "things [were] not going right[,]" but she said that she had not had any panic attacks. (*Id*.). Willis also complained that the Effexor had been making her drowsy. Dr. Sim instructed Plaintiff to continue taking Effexor, but she also

---

[27]"Proptosis" is the bulging, protrusion, or forward displacement of a body organ or area. *Id.* at 1334.

prescribed Buspar, to treat her anxiety. (Tr. at 838). She then recommended that Willis return in two to three months. (Tr. at 838, 842).

On May 2, 2013, Plaintiff returned to Dr. Chow. (Tr. at 791-95). Willis stated that she is able to walk one hundred feet without stopping, but that she does experience some dyspnea. (Tr. at 791). She continued to complain of an occasional cough, producing phlegm. Dr. Chow did not alter Plaintiff's medications, and, again, encouraged her to quit smoking. (*Id.*). Willis had another appointment with Dr. Chow on July 25, 2013. (Tr. at 786-90). Plaintiff reported that her symptoms had not substantially worsened, and she stated that she had been compliant with her medications. (Tr. at 786). She admitted that she continued to smoke. Dr. Chow, once again, counseled her to stop smoking, and to return in six months. (Tr. at 787, 789).

On June 25, 2013, Plaintiff presented to Dr. Sarah Ramos ["Dr. Ramos"], a psychiatrist at El Franco Lee Clinic, for a follow-up appointment regarding her anxiety and depression. (Tr. at 822-27). Willis stated that her mood was "so-so[,]" and that her energy varied (Tr. at 822). She said that her sleep had improved, but that she still woke during the night. (*Id.*). Dr. Ramos increased Plaintiff's Buspar dosage, but she did not alter the Effexor dose. (Tr. at 823). She instructed Willis to consider the option of talk therapy, and to return for another appointment in three months. (Tr. at 823, 827).

On July 30, 2013, Willis again saw Dr. Singh. (Tr. at 815-21). She reported feeling consistently fatigued, and she said that her mood had been "ok [sic]." (Tr. at 815). She admitted that she continued to smoke one pack of cigarettes, each day. She said that she had been prescribed Albuterol and Spiriva for her COPD, but that she continued to suffer from dyspnea, on exertion. (*Id.*). Dr. Singh instructed Plaintiff to continue taking her medications, as prescribed, to quit

smoking, and to return if her symptoms worsened. (Tr. at 817, 818).

### *Educational History, Background and Present Age*

At the time of the administrative hearing, Willis was 53 years old. (Tr. at 106). She testified that she had a high school education, and that her past relevant work included her jobs as a coffee shop supervisor and an administrative assistant. (Tr. at 72, 73). She stated that she was terminated from her last job as a coffee shop supervisor. (Tr. at 60).

### *Subjective Complaints*

In her applications for benefits, Willis reported that she suffers from Graves' disease, COPD, chronic heart failure, anxiety, depression, atrial fibrillation, and pulmonary hypertension. (Tr. at 196). She stated that she has difficulty concentrating and remembering things, and that she does not work well under pressure, or in stressful situations. (Tr. at 219). She claims that she can not sit or stand for eight hours, and that she does not have "the energy or ability to perform [] a job." (*Id*.). She also claims that she can walk only fifty yards, before she must stop and rest, and that she must rest for fifteen minutes, before she can resume walking. (Tr. at 224). She reported that her daily activities include reading, watching television, and going to AA meetings. (Tr. at 220). She added that, some days, she does not have the energy to dress or groom herself. Willis also reported that she can no longer perform yard work, maintain employment, travel long distances, or garden. (Tr. at 220, 223). She said that she prepares her own simple meals every day, but that it takes one hour, because she has to rest when her legs get tired. (Tr. at 221). She admitted that she does her own laundry and cleans her room, but that she requires encouragement to perform those tasks. (*Id*.). She said that she goes outside once a day. She said that she drives sometimes, but that her sister drives her if she is feeling anxious or fatigued. (Tr. at 222). Plaintiff conceded that she shops for personal items once

27

a week, for approximately thirty minutes, each time. (*Id.*). She reported that she has some difficulty in following written and oral instructions, and that sometimes she must have instructions repeated. (Tr. at 224). Plaintiff also reported that she does not handles changes in routine well, and that she suffers from increasingly frequent panic attacks. (Tr. at 225).

At the hearing, Willis testified to the severity and debilitating effects of the impairments from which she suffers. (Tr. at 59-83, 90-93). She stated that she struggles with anxiety and depression. (Tr. at 62). She said that she sleeps most of the day, and that she then has trouble sleeping at night. Willis told the ALJ that her mental health has deteriorated since she stopped working. (Tr. at 63, 81). She explained that some days she "do[es]n't feel like doing anything[,]" and that she does not "go many places except to AA meetings." (Tr. at 65). She testified that she spends about six hours in her room, each day, and that she cries, daily. (Tr. at 75-76). Willis said that her heart races when she feels anxious, and that the episodes last about five or ten minutes. (Tr. at 63). She explained that she experiences panic attacks, daily, but that her anxiety subsides with deep breathing or exercise. (Tr. at 63). She also said that sitting for long periods aggravates her anxiety. (Tr. at 68). She reported that she takes Effexor and Buspar to control those symtpoms. She stated that those medications are "somewhat" effective for treating her anxiety and depression, but that they "make[] [her] tired." (Tr. at 64). Willis told the ALJ that she has trouble focusing on the same task for eight hours, because of her poor mental health. (Tr. at 72). However, she admitted that she is able to care for her daily needs. (Tr. at 65).

Plaintiff also reported that she suffers from COPD. (Tr. at 62). She testified that she has difficulty breathing, because of that condition. (Tr. at 76). She said that, at her last job, she became tired more easily than her co-workers, and that she took more breaks than other employees. (*Id.*).

She told the ALJ that she "get[s] out of breath" when she walks one block. (Tr. at 67-68). She stated that she uses an inhaler to treat her COPD symptoms, and she said that those symptoms are part of the reason that she was terminated by her most recent employer. (Tr. at 64, 77).

Willis told the ALJ that she had been diagnosed as suffering from chronic heart failure. (Tr. at 82). She said that she also suffered from moderate to severe pulmonary arterial hypertension. (Tr. at 83). Willis claims that she had a heart attack in January, 2011, and that she was hospitalized for one week after that event. (*Id*.).

Plaintiff testified that she suffers from Graves' disease. (Tr. at 68). She reported that she is unable to stand for long periods, due to leg cramping. (*Id*.). She also reported that she is unable to lift items, like she "used to[,]" and that she can only lift items weighing no more than ten pounds. (Tr. at 68,69). She testified that she takes nine different prescriptions each day for her ailments, and that her medications make her "groggy." (Tr. at 70, 77-79).

Plaintiff testified that she currently lives with her sister and brother-in-law. (Tr. at 59). She said that she performs very little housework, and that she spends most of her time reading and doing crossword puzzles. (Tr. at 66). She added that she has difficulty in concentrating. (Tr. at 66, 67). Willis explained that when she watches television, she sometimes has trouble following the plot. (Tr. at 69). She said that she is unable to cook large meals, and that she does not do grocery shopping. (*Id*.). She reported that she attends church, but that she sits in the back of the sanctuary, because of her anxiety. (Tr. at 67).  She said that she is able to drive, and that, in a typical week, she drives about three or four times. (Tr. at 59). Plaintiff told the ALJ that she did not think that she could live alone. (Tr. at 79).

***Expert Testimony***

The ALJ also heard testimony from Mr. Byron Pettingill, a vocational expert witness. (Tr. at 83-90). He characterized Willis' prior work experience, as a coffee shop supervisor, as "light," in exertional level, and "skilled," as a customer service retail person, as "light," and "semiskilled," as a general office clerk as "sedentary," and "semiskilled," and as a customer service representative as "sedentary," and "semiskilled." (Tr. at 85, 93). Following his summary, the ALJ posed a series of hypothetical questions to Mr. Pettingill, to assess Willis' residual functional capacity:

Q   [A]ssume [an] individual who is limited to a range of light, lifting [and carrying items weighing] 20 pounds occasionally, [and] 10 pounds frequently. Sitting up to 6 hours in an 8-hour day; standing and walking for six hours total within the eight hour day. Pushing and pulling as much as lifting and carrying. The [] individual would also be precluded from being around atmospheric irritants such as dust [and] gases. Would [this] individual be able to perform the past relevant work?

A   The customer service position should be able to be performed, Your Honor. When you say ["]shouldn't be around gases and irritants,["] are you speaking in terms of an industrial setting[?]

Q   Correct. Airborne irritants like in an industrial setting. []

A   I don't think that [would be a] limitation, in the context that you're using it[.] I think the [] coffee shop [supervisor] position should be able to be performed as well.

\* \* \*

Q   Taking the same hypothetical individual with the additional limitations of [being] able to perform only simple tasks and making simple work-related decisions. Would [this] individual be able to perform [Willis'] past jobs?

A   No, sir. Not in my opinion.

Q   And would there be other work? And if so, can you give me three examples?

A   Yes, sir. An unskilled office clerk. . . there are about 5,000 positions in the region. . . and about 150,000 positions nationally. A second occupation would be a food production worker[, and there are] about 3,000 positions in the region and [] 90,000

nationally. Another [occupation] [] would be cafeteria worker[,] [a]nd there are [] 4,000 positions in the region and [] 125,000 nationally.

Q      The same hypothetical individual, except [she] would be off task two hours per day due to fatigue. Would [this] individual be able to perform any jobs?

A      Not in my opinion.

* * *

Q      [I]s it correct [that an individual who] work[ed] as a [restaurant] supervisor [] would be able to perform [] work as a customer service [retail representative]?

A      Yes, sir. In my opinion.

(Tr. at 84-87, 93). Willis' attorney then cross-examined the vocational expert witness, asking the

following questions.

Q      Assuming that that individual is absent three days per month, would there be any jobs in the national economy that such an individual could perform?

A      No, sir.

Q      Assume that the hypothetical individual would have a panic attack on the job[,] probably lasting five minutes[,] but during that period [] the claimant would have to go into a closed environment and could not be disturbed. The panic attack would occur maybe one a day. And again, during that period [] the person would have to go into a closed environment and not be exposed to the coworkers or to the public. How would that affect an individual to maintain employment and work eight hours a day, five days a week, 52 weeks a year on a sustained basis in your professional opinion?

A      It would depend on the environment [and the level of] access, when you say a closed environment, she could just go into a back office. I don't think five minutes out of an eight hour day would preclude [] employment. A lot of people work with anxiety issues. But it just would depend on the length and degree of the panic attack.

(Tr. at 94-95).

### *The ALJ's Decision*

Following the hearing, the ALJ made written findings on the evidence. From his review of

31

the evidence, he determined that Willis suffers from "Grave's [sic] disease, chronic obstructive pulmonary disease, chronic heart failure, depression, and anxiety." (Tr. at 39). Next, he found that Plaintiff's medically determinable hypertension and alcohol dependence are not severe impairments. (*Id.*). He further found that Plaintiff's impairments do not meet, or equal in severity, the medical criteria for any disabling impairment in the applicable SSA regulations. (Tr. at 39-41). The ALJ then assessed Willis' residual functional capacity and found that she has the RFC to perform "light work," as defined by the Act. That is, she can:

> lift and carry 20 pounds occasionally and 10 pounds frequently, sit for a total of 6 hours in an 8-hour workday[,] and stand and/or walk for a total of 6 hours in an 8-hour workday. The claimant is able to push and pull as much as she is able to lift and carry. [She] is precluded from atmospheric irritants such as dust and gases. Mentally, [she] is limited to simple tasks and simple work-related decisions.

(Tr. at 42). The ALJ concluded that, while Willis' impairments could reasonably be expected to cause the alleged symptoms, her testimony regarding the limiting effects of her conditions is inconsistent with the RFC assessment. (Tr. at 43). Based on the medical records and Mr. Pettingill's testimony, the ALJ determined that Willis is not capable of performing her past relevant work. (Tr. at 48). However, he found that Plaintiff could perform such jobs as an office cleaner, a food production worker, and a cafeteria worker, and that such jobs exist in significant numbers in the national economy. (Tr. at 49). For that reason, the ALJ concluded that Willis is "not [] under a 'disability,' as defined in the Act," and he denied her application for benefits. (*Id.*). That decision prompted Plaintiff's request for judicial review.

In this action, Plaintiff complains, first, that the ALJ improperly considered the effects of smoking in assessing her residual functional capacity. (Plaintiff's Motion at 6–8). She insists that the ALJ erred when he relied on her failed attempts to stop smoking to support a finding that she is

not disabled. (*Id*.). Plaintiff also alleges that the ALJ's RFC finding is not supported by substantial evidence. (*Id*. at 9-10). In that regard, she claims that the ALJ's finding that she cannot work in environments that contain "dust and gases" contradicts his determination that she can perform work that exists in the economy. (*Id*. at 9).

It is well settled that judicial review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence, and whether the ALJ applied the proper legal standards in making it. *See Myers v. Apfel*, 238 F.3d 617, 619; *Newton*, 209 F.3d at 452 (citing *Brown*, 192 F.3d at 496). Any conflict in the evidence is to be resolved by the ALJ, and not the court. *See id*. A finding of "no substantial evidence" is proper only if there are no credible medical findings or evidentiary choices that support the ALJ's decision. *See Johnson*, 864 F.2d at 343-44 (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

### *Failure to Stop Smoking*

In his decision, the ALJ acknowledged that Plaintiff suffers from COPD and chronic heart failure, and that those conditions are severe. (Tr. at 39). However, the ALJ ultimately found that those conditions are not disabling impairments. (Tr. at 43). Willis contends that the ALJ improperly based his findings on the supposition that her "failure to stop smoking militates against a finding of disability." (Plaintiff's Motion at 6-8; Tr. at 43) (citing *Fletcher v. Califano*, 471 F.Supp. 317, 320 (N.D. Tex. 1979). She claims that the ALJ's assumption that her COPD and chronic heart failure would be controlled if she quit smoking is "mere speculation[,] [] that is not supported by the evidence." (Plaintiff's Motion at 6-7). Plaintiff insists that, had the ALJ properly considered her allegations concerning those conditions, he would have found that she is disabled. (*Id*. at 8). Defendant, on the other hand, argues that the ALJ appropriately considered the all of the evidence

concerning Plaintiff's conditions during the alleged period of disability. (Defendant's Response at 2–5).

A claimant's residual functional capacity is her "remaining ability to work despite all of her limitations resulting from her impairment[s]." *Jones v. Atrue*, No. H-09-0656, 2010 WL 1404124, at * 10 (S.D. Tex. Mar. 31, 2010) (citing 20 C.F.R. § 404.1545). In evaluating the claimant's RFC, the ALJ must consider how the claimant's impairments affect her physical, mental, and other abilities, as well as the total limiting effects of her impairments. *Id.* The ALJ has the sole responsibility for determining a claimant's RFC based on the record as a whole. *See Villa v. Sullivan*, 895 F.2d 1019, 1023-24 (5ᵗʰ Cir. 1990).

Here, the record shows that the ALJ considered Plaintiff's allegedly "disabling breathing difficulties" in his RFC assessment, but, ultimately, he concluded that her "statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible." (Tr. at 43). In evaluating the evidence, the ALJ noted that Willis reported improvement in her dyspnea. (Tr. at 44, 46, 571, 791). In fact, she stated, explicitly, that her "shortness of breath ha[d] improved significantly[,] and [that it was] not limiting her activities." (Tr. at 571). The ALJ also noted that, despite Plaintiff's subjective complaints, the objective medical evidence showed that her COPD and chronic heart failure were not disabling impairments. (Tr. at 44-46). A spirometry test, given on October 31, 2011, showed that Plaintiff had normal lung volumes, with mildly reduced diffusing capacity. (Tr. at 570). Another spirometry test, given on February 7, 2013, revealed a mild pulmonary obstruction, and a resting oxygen saturation of 99%. (Tr. at 806). Willis' physicians have also described her COPD as "mild." (Tr. at 554). In addition, Plaintiff's physicians have noted that her lungs are clear, without wheezing, and respiratory examinations, in May and November, 2011,

showed no abnormalities. (Tr. at 45, 418-19, 423, 549, 563, 587, 613). A chest x-ray, dated January, 19, 2011, showed minimal chronic heart failure. (Tr. at 346). An electrocardiogram, dated September 8, 2012, revealed no cardiac abnormalities. (Tr. at 509).

Indeed, an ALJ's assessment of a claimant's credibility is given great deference, and he is not required to give greater weight to a claimant's subjective complaints than to contrary objective medical evidence. *Newton*, 209 F.3d at 459. Although subjective complaints may provide evidence of an impairment, they must be corroborated by objective medical evidence. *Brown v. Astrue*, 2012 WL 9392190, at *8 (S.D. Tex. 2012) (citing *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989)). In this case, the objective medical evidence does not support Plaintiff's subjective complaints concerning the severity of her COPD and chronic heart failure. Without corroborating medical evidence, Willis' subjective complaints carry scant weight.

Moreover, an impairment that can be reasonably remedied or controlled by medication or treatment is not disabling and does not affect RFC. *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1998) (per curiam). A claimant must follow her physician's prescribed treatment plan if it can restore the claimant's ability to work. 20 C.F.R. §404.1530(a). If a claimant does not follow the prescribed plan, without good cause, an ALJ cannot find that the claimant is disabled. 20 C.F.R. § 404.1530(b); *Johnson v. Sullivan*, 894 F.2d 683, 685 (5th 1990). "It is also within the ALJ's discretion to discount a claimant's subjective complaints based on [her] decision not to follow physicians' recommendations." *Lavery v. Astrue*, No., 2012 WL 3276711, at *7 (S.D. Tex. Aug. 8, 2012). Under such circumstances, an ALJ may construe the claimant's failure to follow the recommended treatment as an indication that Plaintiff's symptoms are not that severe, because they did not cause her to follow the physicians' advice. *Id.*; *Tolliver ex rel. Tolliver v. Astrue*, No. 11-

35

0039, 2012 WL 566906, *6 n.8 (W.D. La. Jan. 23, 2012) (noting that the claimant continued to smoke one and one-half packs of cigarettes, each day, despite having been warned by his doctor to stop smoking four years earlier).

Medical records show that Willis' physicians repeatedly instructed her to stop smoking, yet she failed to do so. (*See, e.g.*, Tr. at 346, 385, 414, 477, 515, 574, 744, 757, 779, 787, 791, 799, 806, 817). Plaintiff likewise failed to take the nebulizer medications that had been prescribed to treat her COPD. (Tr. at 571, 804). Although there is no cure for COPD, the National Institute of Health (NIH) advises that smoke cessation "is the best way to slow lung damage." *Chronic obstructive pulmonary disease*, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/000091.htm (last visited March 22, 2017). Had Willis quit smoking and taken her medications, as prescribed, the progression of her lung disease is likely to have slowed. Given Plaintiff's reports of improving dyspnea, the evidence suggests that, with smoke cessation and appropriate treatment, her symptoms would have been controlled. On this record, the evidence supports the ALJ's conclusion that Willis' COPD and chronic heart failure were not disabling impairments. *Kramer v. Astrue*, No.G-08-185, 2009 WL 2488127, at *6 (S.D. Tex. Aug.6, 2009) (finding that claimant was not disabled where claimant was asked repeatedly to stop smoking, but "postponed or failed to follow" treatment suggested). On this point, the ALJ did not err.

### *Environmental Irritants*

Plaintiff claims that the ALJ's RFC assessment is not supported by substantial evidence, because he found that she can maintain employment, notwithstanding the finding which "preclude[s] [her from working in an environment with] atmospheric irritants, such as dust and gases." (Plaintiff's Motion at 9; Tr. at 42). The record shows that Dr. Ligon, a consulting physician,

36

prepared an evaluation of Willis' physical RFC on July 13, 2012. (Tr. at 465). In that assessment, he determined that she should avoid concentrated exposure to environments containing fumes, odors, dusts, gases, and poor ventilation systems. (*Id*.). The ALJ considered those respiratory limitations when he questioned the vocational expert, specifically asking whether there were jobs available in the economy that Plaintiff could perform, with a light RFC, where she would not be exposed to atmospheric irritants, including dusts and gases. (Tr. at 86). When the vocational expert witness asked the ALJ for clarification regarding the meaning of "atmospheric irritants," he explained that he meant "[a]irborne irritants [that might be found] in an industrial setting." (*Id*.). The witness responded affirmatively, and he identified the jobs of a coffee shop supervisor, a restaurant supervisor, an office helper, a food production worker, and a cafeteria worker. (Tr. at 86-87).

It is well established that an ALJ may properly rely on testimony and conclusions from a vocational expert witness, that available jobs exist for a claimant. *Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir. 2000); *see Leggett*, 67 F.3d at 565. The Fifth Circuit has observed frequently that "[t]he value of a vocational expert is that he [or she] is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Carey*, 230 F.3d at 143-44. In this case, the ALJ appropriately relied on the testimony from a vocational expert witness, which was given in response to a hypothetical question, that contained limitations based on of the evidence of record. *Hickley v. Astrue*, No., 2010 WL 3835113, at * 6 (N.D. Tex. Aug. 2, 2010) ("The hypothetical presented to the vocational expert must reasonably incorporate all of the disabilities recognized by the ALJ's residual functional capacity assessment[.]") (citations omitted). On this point, the ALJ did not err.

In sum, the ALJ appropriately determined that Willis' claims regarding the severity of her

COPD and chronic heart failure were not entirely credible. The objective medical evidence does not support Plaintiff's subjective complaints, and she has failed to follow the prescribed treatment, which may have controlled her symptoms. As such, the ALJ correctly determined that Plaintiff's COPD and chronic heart failure are not disabling impairments. Further, the ALJ appropriately incorporated the environmental limitations from the residual functional capacity assessment into the hypothetical question posed to the vocational expert witness. He then relied on that responsive testimony to determine that appropriate jobs are available to Willis. For these reasons, Defendant's motion for summary judgment is granted, and Plaintiff's motion is denied.

**Conclusion**

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment is **GRANTED**, and that Plaintiff's motion for summary judgment is **DENIED**.

**SIGNED** at Houston, Texas, this 28th day of March, 2017.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**